IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCHWARTZ T.P. INC., | ) |
| Plaintiff, | ) Civil Action No. |
| v. | ) |
| CHRISTOPHER A. MCCARTHY | ) *Electronically Filed* |
| Defendant. | ) |

**BRIEF IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Schwartz T.P. Inc. ("Schwartz" or the "Company"), by and through its undersigned counsel, files the following brief in support of its Motion for Preliminary Injunction against Defendant Christopher A. McCarthy ("McCarthy").

## I. INTRODUCTION

This action arises out of McCarthy's breach of the Employment Agreement ("Agreement") he executed with Schwartz, his former employer. McCarthy, who resigned his employment with Schwartz, effective April 30, 2014, has commenced employment with Schwartz's competitor, Timco, Inc. ("Timco"), in direct violation of the restrictive covenants set forth in the Agreement. On behalf of Timco, McCarthy is now using Schwartz's confidential information and trade secrets to actively solicit Schwartz's clients despite his agreement not to. As more fully set forth below, McCarthy's unlawful actions threaten to irreparably harm Schwartz by impeding its ability to compete fairly in the marketplace and by damaging its reputation and customer goodwill. Unless McCarthy is enjoined from further unlawful activity, Schwartz will suffer irreparable harm from which there is no adequate legal remedy.

Accordingly, Schwartz's motion should be granted and the Court should issue an order enjoining McCarthy from violating the Agreement.

## II.  FACTUAL BACKGROUND

### A.  Schwartz's Business, Client Relationships, And Confidential Information

Schwartz is a leading manufacturer and supplier of custom-made technical plastics for use in a wide range of industrial fields. (Compl., ¶7). In particular, Schwartz specializes in the production of high impact resistant plastics and large-sized and complex components made of application specific materials PA6G, PA12G and POM. (*Id*. at ¶¶8-9). Schwartz is involved in the research, development, engineering, construction and marketing of technical plastics. (*Id*. at ¶10). Being involved in each stage from start to finish makes Schwartz unique in its field and the confidentiality of its proprietary trade secrets imperative to its continued success. (*Id*.).

Schwartz has developed a significant international client base in a broad range of industries. (*Id*. at ¶11). More recently, Schwartz expanded its market to the United States where it offers its products and services to customers in areas such as crane and hoisting technology, elevators and escalators, drive and conveyor technology, offshore drilling and excavation, steel and rolling mills, and railway technology, among others. (*Id*. at ¶12). Given the specialized nature of Schwartz's products, the Company's client base is focused and limited to businesses that can utilize technical plastics in their trade. (*Id*. at ¶13). Accordingly, a large part of Schwartz's business is dependent upon developing and maintaining its relationships with clients and customers. (*Id*. at ¶13). Schwartz is focused on growing its U.S. business and has expended significant resources developing its reputation and a targeted customer base in this country. (*Id*. at ¶14). Schwartz has invested significant time, expense and resources to create and maintain its client relationships and to establish and build new connections in the U.S.. (*Id*. at ¶15). Through its hard work, high-quality products, and unique applications, Schwartz has

developed substantial goodwill, trade, and patronage, all of which are extremely valuable to the Company and its future success. (*Id*. at ¶16).

Schwartz employs a sales team to service existing clients and to build relationships with and introduce clients in these industries to the benefits of technical plastic components as compared to steel or other metal parts more traditionally used. (*Id*. at ¶17). In order to effectively pitch Schwartz's products and services to clients and prospective customers, Schwartz's sales employees are educated on Schwartz's products and are provided access to confidential information and trade secrets regarding, among other things, product development, testing, and performance. (*Id*. at ¶18). Sales employees also spend a significant time communicating with and learning confidential information about Schwartz's clients including, but not limited to, their needs, internal structures, deliverable specifications, and pricing sensitivity. (*Id*. at ¶19).

Schwartz maintains client information including contact information for relevant decision-makers within the customer and potential customers. (*Id*. at ¶20). Schwartz also maintains confidential trade secret information related to the development and testing of its products, specific performance of its products, and application of components to be used in conjunction with other materials. (*Id*. at ¶21). Schwartz has implemented reasonable efforts to maintain the secrecy of its confidential trade secret information. (*Id*. at ¶22). Specifically, Schwartz password-protects access to databases that contain such information, encrypts data, and limits the use of test results and other confidential information to only those employees with a specific need for access. (*Id*. at ¶23). Moreover, Schwartz requires employees to execute employment agreements containing confidentiality and non-disclosure provisions. (*Id*. at ¶22).

Schwartz's trade secrets, confidential information, and client relationships have

significant economic value to Schwartz (and would be likewise valuable to a competitor), and the Company has a legitimate business interest in keeping such information confidential, in maintaining its client base, and not allowing the information to be disclosed to its competitors through any improper means.

      **B.**     **McCarthy's Employment With Schwartz**

McCarthy was employed by Schwartz from June 8, 2009, until April 30, 2014, as the U.S. Sales Manager for all Schwartz's U.S. sales. (*Id*. at ¶¶ 24-25). As a condition of his employment with Schwartz, McCarthy signed the Agreement on June 8, 2009. (*Id*. at ¶26). Pursuant to the express terms of the Agreement, McCarthy agreed, *inter alia*: (1) to protect and maintain the confidentiality of Schwartz's trade secrets and proprietary information; and (2) to refrain from soliciting Schwartz's customers and/or becoming employed with one of Schwartz's competitors for a period of two years following the termination of his employment. (*Id*. at ¶¶ 27-28). The non-disclosure covenant is set forth in Section 6 of the Employment Agreement and provides, in pertinent part:

> Employee acknowledges that: (1) the Company's products are highly specialized items; (2) the identity and particular needs of the Company's customers are not generally known in the industry; (3) the Company has a proprietary interest in the identity of its customers and customer lists; and (4) documents and information regarding the Company's methods of production, sales, pricing, costs, and the specialized requirements of the Company's customers, are highly confidential, and constitute trade secrets. Under no circumstances shall Employee remove from the Company's office any of the Company's books, records, documents, or customer lists, or any copies of such documents, without the written permission of the Company; nor shall Employee make any copies of such books, records, documents, or customer lists, for use outside of the Company's office except as specifically authorized by the Company.

*    *    *

> During the term of this Agreement, Employee will have access to and become familiar with various trade secrets and confidential information of

> the Company… Employee acknowledges that such Confidential Information and trade secrets are owned and shall continue to be owned solely by the Company. During the term of his employment and after such employment terminates, Employee will keep all Confidential Information in strict confidence during the term and thereafter and will never, directly or indirectly, make known, divulge, reveal, furnish, make available or use any Confidential Information (except in the course of his regular authorized duties on behalf of the Company or an affiliate of the Company). Furthermore, Employee will not utilize any Confidential Information for his own benefit or the benefit of others during the term and thereafter.

(*Id*. at ¶28). The covenant not-to-compete is contained in Section 7 of the Employment Agreement and stipulates that:

> During the term of this Agreement and for a period of two (2) years …after a termination for the reasons set forth in Section 2 becomes effective (i) Employee will neither directly nor indirectly engage in or contribute his knowledge to any work or activity that involves semi-finished or finished products made of case polyamide (Pa6/PA12) and compressed moulded phenolics ("Competitive Work"), (ii) Employee will not accept employment with or provide consulting service to Quadrant; Rochling Sustaplast, Kern, Ensinger, Licharz or other competitors that produce or intend to produce finished parts made out of Polyamide…

(*Id*. at ¶27). As Sales Manager, McCarthy was responsibility for maintaining, expanding and soliciting client business and selling Schwartz's products to customers. (*Id*. at ¶¶32-33). In this role, McCarthy had access to Schwartz's confidential information and trade secrets, including customer lists, Schwartz research material, password-protected internal databases where confidential and proprietary testing and engineering material is kept, client-specific pricing strategies, buying history and trends, cost information, and prospective client information. (*Id*. at ¶34). At the time of his resignation McCarthy primarily serviced U.S. client accounts, and those clients' collective value to Schwartz, based on annual revenue, was approximately $2 million. (*Id*. at ¶35).

    C.    **McCarthy's Breach Of The Employment Agreement**

On April 30, 2014, McCarthy abruptly resigned his employment from Schwartz, effective

5

that same date. (*Id*. at ¶36). McCarthy's last day of work with Schwartz was April 30, 2014. (*Id*. at ¶37). Immediately following his resignation from Schwartz, McCarthy began working for Timco as Regional Sales Manager. (*Id*. at ¶38). Timco, a company that manufactures and designs fabricated engineering plastic parts for industrial equipment using materials such as polyamide, directly competes with Schwartz. (*Id*. at ¶¶44-45).

In his role with Schwartz, McCarthy had access to confidential and proprietary information related to all aspects of the Schwartz business. (*Id*. at ¶39). This information can be duplicated by competitors such as Timco and enable the competitor to produce an identical product without expending the resources, both intellectual and economic, to design and manufacture the product from concept through production. (*Id*. at ¶40). Schwartz is a pioneer in its field in part due to the research and testing it completes when developing its products. (*Id*. at ¶41). In his sales efforts, McCarthy utilized this proprietary information to market Schwartz products and was trusted with the information regarding the technical nature of the products in order to provide the customer with the best possible component to suit their business needs. (*Id*. at ¶42).

As a sales manager, McCarthy would meet with high-level contacts at Schwartz's customers and potential customers to market Schwartz's line of products. (*Id*. at ¶43). Timco has a nearly identical customer base as Schwartz. (*Id*. at ¶44). Timco is a related entity to Schwartz's largest competitor, Licharz. (*Id*.). McCarthy will be selling a product line nearly identical to the products he sold for Schwartz. (*Id*. at ¶46). McCarthy has reached out to several Schwartz clients to discuss moving their business from Schwartz to Timco in direct contravention of his agreement with Schwartz. (*Id*. at ¶47).

6

On or about May 15, 2014, McCarthy gave his new business card, noting his new title and position with Timco as Regional Sales Manager, to Schwartz's Europe-based Sales Manager, Phin Fraser ("Fraser").(*Id*. at ¶48). McCarthy then requested Fraser refrain from telling anyone at Schwartz that he is now with Timco. (*Id*. at ¶49).

On May 15, 2014, current Schwartz customer, ("Customer A")[1] reported to Schwartz that McCarthy had contacted him regarding replacing the orders for bearings that are currently with Schwartz with Timco products. (*Id*. at ¶50). On June 18, 2014, Customer A further reported to Schwartz that he had been contacted "3 or 4 times" by McCarthy and that McCarthy had told him that Schwartz was bankrupt. (*Id*. at ¶51). This statement was false and was intended by McCarthy to damage Schwartz's business for the benefit of Timco. (*Id*. at ¶52). McCarthy further requested that Customer A send all of his drawings and details for upcoming orders so that McCarthy could give him a quote for Timco to supply Customer A with his parts and bearings previously ordered through Schwartz. (*Id*. at ¶53). On June 24, 2014, a second Schwartz customer ("Customer B") reported to Schwartz that McCarthy had reached out to him to discuss moving his business to Timco and told Customer B that Schwartz was bankrupt. (*Id*. at ¶54). Customer B was extremely upset that he had not heard from Schwartz about the possibility of bankruptcy and despite Schwartz's reassurances that McCarthy's statements were inaccurate, Customer B requested a meeting and further explanation of the financial status of the company before placing additional orders. (*Id*. at ¶55).

### III. STANDARD OF REVIEW

In determining whether to grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), a court must consider whether the party seeking the injunction has

---

[1] Schwartz will reveal the identity and details of its communications with those customers identified herein as "Customer A" and "Customer B" upon entry of an appropriate protective order.

7

satisfied four factors. Initially, the court must determine (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. *K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013). If these two threshold showings are made the court then considers, to the extent relevant, (3) whether an injunction would harm the defendants more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest. *Id*. (citing *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002). As set forth below, Schwartz can readily establish that each of these four factors compels the issuance of injunctive relief.

## IV. ARGUMENT

### A. Schwartz Has A Reasonable Probability Of Success On The Merits Of Its Claims Against McCarthy

As set forth below in detail, Schwartz can demonstrate a reasonable probability of success on its breach of contract and misappropriation claims against McCarthy. The Agreement is valid and enforceable under Pennsylvania law, and McCarthy breached that Agreement by accepting employment with Timco and using Schwartz's confidential information to solicit its customers on behalf of Timco. Further, Schwartz's confidential information constitutes valuable trade secrets worthy of the Court's protection, and Schwartz has misappropriated those trade secrets by using and disclosing them in connection with his employment with Timco.

#### 1. Schwartz can establish a reasonable probability of success on the merits of its breach of contract claim.

The Agreement, by its terms, is governed in accordance with the laws of Pennsylvania. (Compl., ¶ _). To succeed on the merits of a breach of contract claim under Pennsylvania law, a plaintiff must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *CentiMark Corp. v. Jacobsen*, Civ. No. 11-1137, 2011 U.S. Dist. LEXIS 136996, *18 (W.D. Pa. Nov. 29, 2011) (citing *Ware v.*

8

*Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

Here, McCarthy signed the Agreement in June 2009 as a condition of commencing employment with Schwartz. (Compl., ¶26). Pursuant to the express terms of the Agreement, McCarthy agreed, *inter alia*: (1) to protect and maintain the confidentiality of Schwartz's trade secrets and confidential and proprietary information; and (2) to refrain from soliciting Schwartz's customers and/or becoming employed with one of Schwartz's competitors for a period of two years following the termination of his employment. (*Id*. at ¶¶27-28). McCarthy's Agreement was supported by valid consideration – namely, his employment with Schwartz. *See SKF USA, Inc. v. Okkerse*, Civ. No. 13-5111, 2014 U.S. Dist. LEXIS 5571, 40-41 (E.D. Pa. Jan. 15, 2014) (When a restrictive covenant is contained in the initial contract of employment, consideration for the restrictive covenant is the job itself). Thus, the restrictive covenants contained in the Agreement are valid.

They are also enforceable. Under Pennsylvania law, for a restrictive covenant to be enforceable, (1) it must be incident to an employment relation between the parties to the covenant, (2) the restrictions must be reasonably necessary for the protection of the employer, and (3) the restrictions must be reasonably limited in duration and scope. *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007).

Although the agreement does not include a specific geographic limitation, the Agreement is narrowly tailored to restrain McCarthy only from contributing his knowledge regarding semi-finished or finished products made of casat polyamide (Pa6/PA 12) and compressed moulded phenolics and from accepting employment with direct competitors. Pennsylvania courts have routinely upheld restrictive covenants with a comparable temporal scope. *Fisher BioServices, Inc. v. Bilcare, Inc.*, 2006 U.S. Dist. LEXIS 34841, at *41 (E.D. Pa. May 31, 2006) (agreement is

enforceable where plaintiff seeking not to impose any geographic restriction, rather only to prevent employee from soliciting contacts from the specific pharmaceutical business); *Quaker Chem. Corp.*, 509 F. Supp. 2d at 477 (enforcing a covenant not to compete which was unlimited in geographic scope, but prevented employee from working for plaintiff's competitors located anywhere in the world for a period of one year); *Victaulic Co. v. Tieman*, 499 F.3d 227, 237-238 (3d Cir. 2007) (noting that "[i]n this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated" and finding that a restrictive covenant preventing an employee from selling certain products for nine named competitors anywhere its products were sold was reasonable).

Applying these principles, the restrictive covenants in this case are enforceable. The restrictive covenants are clearly ancillary to McCarthy's employment relationship with Schwartz. *See e.g. QVC, Inc. v. Bozek*, Civ. No. 96-1756, 1996 U.S. Dist. LEXIS 4770, *9 (E.D. Pa. 1996) (noting that "[b]ecause the non-compete provision is part of defendant's employment agreement and is intended to prevent him from disclosing information obtained through his employment, the provision related to defendant's employment contract"). Additionally the restrictions are reasonably necessary for the protection of Schwartz. *See e.g. Plate Fabrication & Machining, Inc. v. Beiler*, Civ. No. 15-2276, 2006 U.S. Dist. LEXIS 52, *16 (E.D. Pa. Jan. 3, 2006) (Pennsylvania law permits an employer to protect its legitimate, non-pecuniary business interests, including, trade secrets, confidential information, and customer goodwill, through the use of post-employment restrictive covenants); *Tuff Wrap Installations Inc. v. Cleanwrap, Inc.*, Civ. No. 11-2576, 2011 U.S. Dist. LEXIS 70543, 24-25 (E.D. Pa. June 29, 2011) ("An employer has a legitimate interest in preventing an employee from leaving to work for a competitor, carrying with him the employer's goodwill, specialized training, and confidential

10

conformation."). *Fisher Bioservices, Inc. v. Bilcare, Inc.*, Civ. No. 06-567, 2006 U.S. Dist. LEXIS 34841, *40 (E.D. Pa. May 31, 2006). ("Customer goodwill and confidential business information have each been recognized as legitimate business interests that may be afforded protection by a restrictive covenant.").

Finally, the Agreement provides for reasonable restrictions as it contains a prohibition against using or disclosing Schwartz's confidential information and has a narrow restriction prohibiting McCarthy, for a period of two years only, from 1) engaging in any work or activity involving semi-finished or finished products made of case polyamide and compressed moulded phenolics, and/or 2) accepting employment with any competitor that produces or intend to produce finished parts made out of Polyamide. (Compl., ¶¶ 27-28). This is precisely the type of restrictive covenant that Pennsylvania courts have consistently enforced. *See e.g. Victaulic Co. v. Tieman*, 499 F.3d 227 (3d Cir. 2007); *see also Quaker Chem. Corp.*, 509 F. Supp. 2d at 477 (upholding a restriction to prevent a former employee from working for plaintiff's competitors located anywhere in the world for a period of one year). *Minn. Mining and Mfg Co. v. Gessner,* 78 F. Supp. 2d 390, 391 (E.D. Pa. 1999) (upholding restrictive covenant which prohibited former employee from rendering services to any Conflicting Organization in the United States, or any country in which plaintiff had a manufacturing plant, for a period of two years after termination of his employment). Therefore, the restrictive covenants contained in the Employment Agreement are enforceable.

Schwartz can clearly show that McCarthy breached the Agreement. It is undisputed that McCarthy began working for Schwartz's competitor, Timco, as a Regional Sales Manager less than one week after his resignation. (Compl., ¶¶38, 48-55). Moreover, Schwartz can also establish that McCarthy has used the Company's confidential information and trade secrets to

11

solicit its customers on behalf of Timco in further violation of the Agreement. (*Id*. at ¶¶ 50-55 _). As a result of McCarthy's unlawful conduct, Schwartz has suffered and will continue to suffer damages in the form of loss of competitive advantage, customers, marketing strategies, and revenue. *See Tuff Wrap Installations Inc.*, 2011 U.S. Dist. LEXIS 70543 at *22 (loss of competitive advantage and damage to reputation are legitimate business interests that constitute a cognizable injury for breach of contract.) Accordingly, there is a reasonable probability that Schwartz will prevail on its breach of contract claim against McCarthy.

> **2. Schwartz can establish a reasonable probability of success on the merits of its claim for misappropriation of trade secrets.**

Under the Pennsylvania Uniform Trade Secrets Act ("UTSA"), 12 Pa. Cons. Stat. § 5301, *et seq*., a trade secret is defined as information, including a formula, drawing, pattern, compilation including customer lists, programs, methods, techniques or processes that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010); *Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 620 (E.D. Pa. 2009). Under the statute, injunctive relief is available to enjoin both the actual and threatened misappropriation of trade secrets. 12 Pa. Cons. Stat. § 5303(a) (stating that "[a]ctual or threatened misappropriation may be enjoined.").

Schwartz can show that McCarthy had access to and utilized its trade secret information on a daily basis while employed by the Company. This includes information related to Schwartz's research materials, product development, testing, and performance, and customer lists. (Compl. ¶¶ 18-19, 34). Further, Schwartz has implemented reasonable efforts to maintain

12

the secrecy of its confidential trade secret information. (*Id.* at ¶¶22-23 ). The time, expense and effort incurred by Schwartz in compiling this customer information and the efforts it has taken to maintain its secrecy warrants a classification of such as trade secrets. *See A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa. Super. Ct. 2000) (where customer lists and similarly valuable information has been compiled through a material investment of the employer's time and money, the employer is entitled to protection of its "trade secrets," independent of a non-disclosure contract); *Feldman v. Cmty. Coll. of Allegheny*, 85 Fed. Appx. 821, 827-828 (3d Cir. 2004) (noting that the Third Circuit Court of Appeals has held that customer lists and data are confidential and entitled to protection as trade secrets); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1263 (3d Cir. 1985) (details of product construction, efficiency factors, and costing and pricing information are trade secrets); *Air Products and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1122 (Pa. Super. Ct. 1982) (information concerning details of research and development projects, projected capital spending program, bidding procedures, and marketing plans all qualify for trade secret protection)**.** Through McCarthy's use of this information to solicit clients on behalf of Timco, he has misappropriated, and threatens to continue to misappropriate, Schwartz's trade secrets. (Compl., ¶¶52-59, 75).

For the foregoing reasons, Schwartz can establish a reasonable probability of success on the merits, and as such, its Motion for Preliminary Injunction should be granted.

**B.     Schwartz Has No Adequate Remedy At Law And Will Suffer Irreparable Harm Without Injunctive Relief**

The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. *Tuff Wrap Installations Inc.*, 2011 U.S. Dist. LEXIS 70543 at *23-24 (citing *Adams v.*

13

*Freedom Forge Corp.*, 204 F.3d 475, 484-485 (3d Cir. 2000). Within the Third Circuit, courts consistently have found that injury to goodwill, loss of customers, and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages. *Id.*; *Fisher Bioservices, Inc. v. Bilcare, Inc.*, 2006 U.S. Dist. LEXIS 34841 (E.D. Pa. May 31, 2006); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chamberlain*, 145 F. Supp. 2d 621, 625-26 (M.D. Pa. 2001) (breach of a non-solicitation and non-disclosure covenant executed by financial consultant required immediate injunctive relief because customers cannot be "unsolicited"); *Sidco v. Paper Co. v. Aaron*, 351 A.2d 250, 257 (Pa. 1976) (former salesman's contact with employer's customers would cause irreparable harm to employer's customer relationships). Further, courts have consistently found irreparable harm in situations where a former employee seeks employment with a similar and/or competing company. *Quaker Chem. Corp.*, 509 F. Supp. 2d at 477; *Telamerica Media Inc. v. AMN Television Marketing*, 1999 U.S. Dist. LEXIS 19423 (E.D. Pa. Dec. 21, 1999); *Nat'l Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998); *Minn. Mining and Mfg Co. v. Gessner*, 78 F. Supp. 2d 390, 391 (E.D. Pa. 1999).

In *Quaker*, the court addressed a situation similar to the instant matter. There, an employee, Varga, left Quaker and shortly thereafter began to work for a competitor, Stuart, despite having signed an agreement with Quaker agreeing not to disclose Quaker's trade secrets and not to compete with Quaker for a period of one year after leaving Quaker's employ. *See Quaker*, 509 F. Supp. 2d at 472-73. The court found that Varga had extensive knowledge of Quaker's confidential information, including trade secrets and specific information regarding customers, both current and potential. *Id.* at 479. Based on this knowledge, the court found that the employee had a "very real opportunity to harm Quaker's legitimate business interest by

14

working for Stuart, and thus, Quaker will likely suffer irreparable harm if Varga is allowed to work for Stuart." *Id*.

The same reasoning applies in this case. Here, using Schwartz's confidential information, McCarthy has actively solicited Schwartz's customers (Compl., ¶¶50-55. Further, his continued employment at Timco as a Regional Sales Manager places him in a prime position to continue to solicit the business of those same customers he serviced or could have serviced while employed by Schwartz. (*Id*.). McCarthy therefore has caused and will continue to cause immediate damage Schwartz's customer relationships and goodwill unless his conduct is enjoined.

    **C.**    **The Harm To Schwartz Outweighs Any Possible Harm To McCarthy**

Granting the preliminary injunction, and thereby enforcing the restrictive covenants, will not result in greater harm to McCarthy than denying it would to Schwartz. The restrictive covenants do not prohibit McCarthy from working in sales. (Compl., ¶27-28). Rather, McCarthy is merely prohibited – for a time period of two years – from working in the narrow technical plastics industry in which Schwartz does business. (*Id*. at ¶27-28). McCarthy "does not have a right to the ideal job, but rather, to be able to earn a livelihood." *National Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998). Further, the self-inflicted nature of any harm suffered by McCarthy weighs heavily in favor of granting preliminary injunctive relief. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 496 (E.D. Pa. 2000) ("The self-inflicted nature of any harm suffered by the wrongdoer weighs heavily in favor of granting preliminary injunctive relief."); *see also Quaker Chem. Corp*., 509 F. Supp. 2d at 481; *Tuff Wrap Installations Inc*., 2011 U.S. Dist. LEXIS 70543 at *26.

    **D.**    **Granting Relief Is In The Public Interest**

Granting Schwartz's motion will serve the public interest in this matter by enforcing

15

valid contractual provisions, protecting valuable business investments, and preventing the unlawful use of confidential information and trade secrets. *See Bimbo Bakeries*, 613 F.3d at 119 (holding that it is in the public interest for courts to "uphold the inviolability of trade secrets and enforceability of confidentiality agreements"); *Quaker Chem. Corp.*, 509 F. Supp. 2d at 477 (noting that "courts have not been reluctant to hold that the public has a greater interest in seeing the non-compete covenant enforced than in allowing the employee to work in the new job.") *Nextgen Healthcare Info. Sys. v. Messier*, Civ. No. 05-5230, 2005 U.S. Dist. LEXIS 27243, *39 (E.D. Pa. Nov. 10, 2005) (noting that "there is an important public interest in enforcing contracts voluntarily entered, particularly those entered by knowledgeable and experienced businessmen."). Accordingly, this factor too favors grant of injunctive relief to Schwartz.

## V. CONCLUSION

For all the foregoing reasons, Schwartz respectfully requests the Court grant its Motion for Preliminary Injunction.

Dated: July 29, 2014

    Respectfully submitted,

*/s/ Theodore A. Schroeder*
Theodore A. Schroeder (PA ID No. 80559)
  tschroeder@littler.com
Jill M. Weimer (PA ID No. 207509)
  jweimer@littler.com
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
Telephone: 412.201.7600
*Facsimile*: 412.774.1959

*Counsel for Plaintiff, Schwartz T.P. Inc.*

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Brief in Support of Plaintiff's Motion for Preliminary Injunction was sent to a process server this 29th day of July 2014 for same day hand delivery upon the Defendant at the address listed below.

Christopher A. McCarthy
2309 Milstead Circle
Maietta, Georgia 30066

/s/ *Theodore A. Schroeder*
Theodore A. Schroeder